STEPHANIE R. PHILLIPS,

   Plaintiff,

*vs.*                                  Civil Action No. 3:07CV18
                                       (Judge John Preston Bailey)

MICHAEL J. ASTRUE,[1]
COMMISSIONER OF SOCIAL SECURITY,

   Defendant.

## REPORT AND RECOMMENDATION/OPINION

Stephanie Phillips brought this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) to obtain judicial review of a final decision of the Commissioner of Social Security ("Defendant" and sometimes "Commissioner") denying her claims for Supplemental Security Income ("SSI") and Disability Insurance Benefits ("DIB") under Titles XVI and II, respectively, of the Social Security Act ("Act"), 42 U.S.C. §§ 401-433, 1381-1383f. The matter is awaiting decision on cross motions for summary judgment and has been referred to the undersigned United States Magistrate Judge for submission of proposed findings of fact and recommended disposition. 28 U.S.C. § 636(b)(1)(B); Fed. R. Civ. P. 72(b); Standing Order No.6.

### I. Procedural History

Stephanie Phillips ("Plaintiff") filed applications for SSI and DIB on June 10, 2004, and June

---

[1] On February 12, 2007, Michael J. Astrue became the Commissioner of Social Security. Pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure, Michael J. Astrue should be substituted, therefore, for former Commissioner Jo Anne B. Barnhart (or Acting Commissioner Linda L. McMahon [if the caption was changed previously]) as the defendant in this suit. No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. §405(g).

17, 2004, respectively, alleging disability since October 8, 2003, due to bilateral carpal tunnel syndrome and pinched nerves in her wrists and elbows (R. 52-55, 66-72). The state agency denied Plaintiff's applications initially and on reconsideration (R. 29-35, 41-43). Plaintiff requested a hearing, which Administrative Law Judge Norma Cannon ("ALJ") held on March 14, 2006, and at which Plaintiff, represented by counsel, Regina Carpenter, and James Ganoe, a vocational expert ("VE") testified (R. 354-82). On May 30, 2006, the ALJ entered a decision finding Plaintiff was not disabled because she could perform a limited range of light work (R. 14-22). Plaintiff filed a request for review with the Appeals Council on July 21, 2006, which was denied, making the ALJ's decision the final decision of the Commissioner (R. 5-7, 10-11).

## II. Statement of Facts

Plaintiff was born on June 15, 1964, was forty-one years old at the time of the ALJ's decision, and is considered a "younger person" under the regulations. See 20 C.F.R. §§ 404.1563 and 416.963 (which defines a younger person as one who is under the age of fifty and whose age will not seriously affect her ability to adjust to other work) (R. 20). Plaintiff had attained three years of college education, was awarded an Associate in Applied Science degree, and has past work experience as an administrative assistant and banking administrator (R. 66-68, 359).

Plaintiff was diagnosed with carpal tunnel syndrome in the early 1990's and underwent two surgeries in 1992 for that condition (R. 127).

Plaintiff had a nerve conduction study done on October 29, 2003, which was normal (R. 134).

H. Kirk Watson, M.D., examined Plaintiff on November 20, 2003, for carpal tunnel syndrome. He noted her prior symptoms had been resolved by the surgeries. Dr. Watson reported that Plaintiff's carpal tunnel syndrome symptoms had returned on the right side (R. 127). He

2

diagnosed "significant carpal tunnel syndrome right with major thenar weakness" and no thenar weakness or carpal tunnel syndrome on the left. Dr. Watson recommended surgery on the right (R. 128).

Plaintiff presented to Matthew P. Darmelio, M.D., on January 13, 2004, with complaints of numbness and tingling in her hands, inability to pick up objects, and pain in her neck and down her back. Dr. Darmelio noted some of Plaintiff's "objective complaints" did not "meet the objective findings in that there [was] a lot of dorsal hand numbness which [was] unrelated to the ulnar and median nerves." Dr. Darmelio found Plaintiff's Tinel's sign was positive on the right, but not the left; Phalen's test was "somewhat" positive bilaterally; and hyperflexion cubital tunnel test was positive bilaterally (R. 140). Plaintiff's Allen's test was negative, and her Spurling's test was positive for pain at her cervical spine. Plaintiff was not diagnosed with thenar muscle atrophy. Dr. Darmelio reviewed Plaintiff's EMG report, which was normal and which showed Plaintiff did not have ulnar or median nerve symptoms. Dr. Darmelio found "the exam confusing" because Plaintiff's dorsal numbness did not "fit with a carpal tunnel on the right hand and . . . with cubital tunnel on the left." Dr. Darmelio referred Plaintiff to Dr. Kennedy for treatment (R. 141).

Thomas J. Kennedy, III, M.D., F.A.C.S., examined Plaintiff on February 19, 2004 (R. 194, 207, 211). He completed an Extended Initial Consultation and AOE/COE of Plaintiff. Dr. Kennedy noted Plaintiff had injured both her upper extremities while doing repetitive activity at work on October 2, 2003 (R. 194). Plaintiff's complaints were for numbness, tingling, and pain in the right hand into the elbow and forearm. Plaintiff stated she dropped items and had loss of dexterity in primarily her right hand. Plaintiff informed Dr. Kennedy she had burning pain in her left hand, irritability at the left elbow, and paresthesias to the left little and ring fingers (R. 198). Dr. Kennedy

3

reviewed Plaintiff's treatment history for carpal tunnel syndrome (R. 194-96). Dr. Kennedy found Plaintiff's Phalen's sign was positive on the right and "suggestive on the left." Plaintiff had inflammation in the right median nerve and her thenar muscles appeared to be atrophic on the right. Plaintiff's right forearm compression was immediate, but not as responsive as the left. There was sensitivity along the left ulnar nerve at the medial epicondyle groove, but otherwise normal ulnar nerve motor and sensory findings. Dr. Kennedy opined Plaintiff had major thenar weakness in the right hand and only minor on the left; no significant carpal tunnel on the left; and left ulnar nerve impingement at the cubital level. Dr. Kennedy recommended Plaintiff proceed with a right carpal tunnel release and possible surgical decompression of the left upper extremity ulnar nerve. Plaintiff informed Dr. Kennedy that she had not worked since December 3, 2003, and had realized some improvement in her symptoms (R. 196).

The examination results for Plaintiff's eyes, ears, nose, mouth, throat, cardiovascular, respiratory, breast, gastrointestinal, musculoskeletal, integumentary, neurological, psychiatric, endocrine, hematologic, lymphatic, allergic, and immunologic systems were normal (R. 196-97). Plaintiff's neck flexion, extension, rotation, and tilt were normal (R. 198). Plaintiff's shoulders abduction, flexion, and extension were normal (R. 199). Plaintiff's elbows were normal, except for positive elbow flexion for ulnar nerve paresthesias (R. 199-200). Flexion, extension, ulnar deviation, and radial deviation tests of Plaintiff's wrists were abnormal: wrist flexion was fifty right and forty-five left; extension was fifty right and thirty left; ulnar deviation was thirty right and fifteen left; and radial deviation was fifteen right and ten left. Plaintiff was positive for volar edema. Plaintiff's ranges of motion of all fingers were normal. Plaintiff's thumbs examination was normal, except for significant atrophy of the abductor pollicis brevis muscles on the right (R. 200). Dr. Kennedy found

Plaintiff had diminished grip and pinch strengths bilaterally, which could have been caused by wrist impingements and possible elbow impingement. Plaintiff's Tinel's test was positive for left ulnar nerve at elbow with positive roll sign and elbow flexion test, for median nerves at both wrists, left ulnar nerve at the wrist, and compression test to the median and ulnar nerves (R. 202, 205). Phalen's test and wrist compression test were positive and wrist flexion test for median and ulnar nerves were positive. Plaintiff's Allen test was negative, bilaterally (R. 203, 205).

Dr. Kennedy's impressions were for bilateral flexor tendon tenosynovitis, work related; bilateral carpal tunnel syndrome, by clinical but negative nerve conduction studies, work related; left cubital tunnel, by clinical but negative nerve conduction studies, work related; and bilateral ulnar nerve impingement at wrists, by clinical but negative nerve conduction study, work related (R. 204). Dr. Kennedy noted Plaintiff had been treated conservatively for her symptoms with anti-inflammatory drugs and night splints (R. 205). Dr. Kennedy opined it was "doubtful" that Plaintiff would need vocational training once she had been "adequately treated." Dr. Kennedy found Plaintiff should have a repeat nerve conduction study; cortisone injections to the left cubital tunnel, carpal tunnel impingements, and ulnar nerve impingements; and right medial and ulnar nerve release if Plaintiff's right carpal tunnel symptoms, atrophy and paralysis of the thenar muscles did not improve (R. 206).

On February 28, 2004, an electromyography exam was performed on Plaintiff for "painful paresthesias of her arms with weakness" and possible carpal tunnel syndrome, cubital tunnel syndrome, and cervical radiculopathy (R. 191, 323). The findings were for bilateral carpal tunnel syndrome and numbness in ulnar distribution. The rest of the study was negative for ulnar neuropathy on either side (R. 193, 325).

On March 11, 2004, Dr. Kennedy examined Plaintiff and filed an Interval Report. Dr. Kennedy reviewed Plaintiff's February 28, 2004, nerve conduction study results, noting it was positive for bilateral carpal tunnel syndrome, was not positive for ulnar neuropathy, and was "borderline for ulnar nerve impingement," bilaterally. He found Plaintiff had not experienced a change in her symptoms since his prior exam (R. 186). He noted she still showed "irritability of the median and ulnar nerves at both wrists and the left ulnar nerve at the elbow." Dr. Kennedy's impressions were as follows: bilateral flexor tendon tenosynovitis, work related; bilateral carpal tunnel syndrome, by clinical but negative nerve conduction study, work related; left cubital tunnel, by clinical but negative nerve conduction study, work related; and bilateral ulnar nerve impingement at wrists, by clinical but negative nerve conduction study, work related. Dr. Kennedy recommended cortisone injections, possible surgical intervention if the injections did not relieve her symptoms, and possible release of the left cubital tunnel (R. 187).

On March 11, 2004, Plaintiff received cortisone injections to her carpal tunnel spaces, ulnar nerve compartments, and left cubital tunnel from Dr. Kennedy (R. 189).

On March 11, 2004, Dr. Kennedy completed an Injury/Illness Status Report for Health Direct, Inc., ("Hdi"), in Farmington, CT, relative to Plaintiff's return to work. He noted Plaintiff had been diagnosed with carpal tunnel and cubital tunnel syndromes and that Plaintiff "need[ed] cortisone injections – to see if gets any relief from pain." Dr. Kennedy opined Plaintiff could return to work on April 30, 2004, a date that could change after his next evaluation of Plaintiff, which was scheduled for April 15, 2004 (R. 190).

On April 7, 2004, Dr. Kennedy completed an examination of Plaintiff and filed an Interval Report. Dr. Kennedy reported Plaintiff's present complaints as "ongoing problems of carpal tunnel and ulnar nerve impingement at the wrists as well as continued symptoms at the elbows" and

6

"ongoing problems relative to pain subsequent to cortisone injections to the median and ulnar nerves at both wrists and the cubital tunnel at the left elbow one month ago." Dr. Kennedy noted Plaintiff did not have any "improvement whatsoever following the[] injections," but had developed "irritability, discomfort and pain in both . . . upper extremities" (R. 182).

Upon examination, Dr. Kennedy found Plaintiff had a positive Tinel's sign, compression test, and wrist flexion test for the median and ulnar nerves of both wrists; a positive roll sign, Tinel's sign, and elbow flexion test for the left ulnar nerve at the cubital tunnel; and positive elbow flexion test at right ulnar nerve and "a problem relative to positive Tinel's sign." Additionally, Dr. Kennedy found Plaintiff did not have any significant improvement in the swelling in the volar wrist compartments, bilaterally. His impression was for the following: bilateral flexor tendon tenosynovitis, work related; bilateral carpal tunnel syndrome, by clinical and positive nerve conduction study, work related; left cubital tunnel, by clinical but negative nerve conduction study, work related; bilateral ulnar nerve impingement at wrists, by clinical but negative nerve conduction study, work related; and possible rheumatoid arthritis versus fibromyositis. Dr. Kennedy recommended Plaintiff be evaluated by a rheumatologist for diffuse inflammation and pain; evaluated by a neurologist for intermittent numbness in facial nerve distribution; and not undergo re-operation on her carpal tunnel. Dr. Kennedy prescribed Vicodin for pain relief (R. 183).

On April 14, 2004, Dr. Kennedy completed an Injury/Illness Status Report for HD*i* in Farmington, CT, relative to Plaintiff's ability to return to work. He listed carpal tunnel syndrome and fibromyositis as Plaintiff's diagnosed conditions. Dr. Kennedy did not list a date on which Plaintiff could return to work (R. 181).

On April 14, 2004, Michael Erdil, M.D., the medical director at Hd*i*, corresponded with Dr.

7

Kennedy, requesting updated medical treatment notes, recommended diagnostic studies, current treatment plan, current assessment of Plaintiff's work abilities, and assessment as to Plaintiff's maximum medical improvement status (R. 179). On that same date, Dr. Kennedy replied to Dr. Erdil. He wrote Plaintiff was "obviously not capable of returning to modified or alternative work owning to . . . excessive symptoms." The symptoms to which Dr. Kennedy referred were as follows: multiple pain points in the musculature of the upper extremities suggestive of fibromyositis and nerve impingement findings involving every level of the peripheral nerves in both upper extremities. Dr. Kennedy estimated that August 1, 2004, would be the earliest date Plaintiff would reach maximum medical improvement (R. 180).

On May 27, 2004, Dr. Kennedy completed an Interval Report of Plaintiff for Worker's Compensation of Massachusetts. He listed Plaintiff's complaints as ongoing problems of carpal tunnel and ulnar nerve impingement of both wrists, muscle spasms and discomfort in her forearm muscles and her upper arms. Dr. Kennedy wrote that Plaintiff did not show improvement in her symptoms, even though she was being treated conservatively with cortisone injections (R. 174). Dr. Kennedy opined Plaintiff needed to be examined by a rheumatologist because she displayed symptoms of either degenerative fibromyositis and/or other primary rheumatidity. Dr. Kennedy's examination of Plaintiff showed positive Tinel's sign, compression test, and wrist flexion test for her median and ulnar nerve, bilaterally. Plaintiff was positive for multiple trigger points in her forearms, upper arms, and neck. Plaintiff also had diffuse edema in her volar wrist compartments and her grip and pinch were distally diminished during the examination Dr. Kennedy performed in conjunction with his May 27, 2004, letter. Dr. Kennedy found Plaintiff had bilateral flexor tendon tenosynovitis, work related; bilateral carpal tunnel syndrome, by clinical and positive nerve

conduction study, work related; left cubital tunnel, by clinical but negative nerve conduction study, work related; bilateral ulnar nerve impingement at wrists, by clinical but negative nerve conduction study, work related; and possible rheumatoid arthritis versus fibromyositis. Dr. Kennedy opined Plaintiff would continue on temporary total disability through June 30, 2004. He recommended Plaintiff should be examined by a neurologist and a rheumatologist, should avoid surgery (due to her fibromyositis symptoms) until she realizes "management of her inflammatory process[es] involving the muscles and tendons," and should continue treating her pain with Vicodin (R. 175).

Again on July 14, 2004, Dr. Kennedy provided an Interval Report to the Worker's Compensation Division, Boston, Massachusetts, relative to Plaintiff's condition. Dr. Kennedy listed Plaintiff's complaints as ongoing numbness and tingling in her hands, pain in her wrists and forearm, weakness in grip and pinch, and muscle spasms. Dr. Kennedy also wrote that Plaintiff had a rash that was "possibly related to a medication" (R. 170). Plaintiff reported "problems with muscle, neck and upper back complaints as well as soreness in the upper and lower extremities." Dr. Kennedy noted Plaintiff "only [took] Vicodin intermittently for her discomfort." The results of Dr. Kennedy's examination of Plaintiff were unchanged from his findings of May 27, 2004. Plaintiff still had markedly positive findings of median and ulnar nerve impingement at the wrists, positive Tinel's sign, positive wrist flexion test, and positive compression test. Plaintiff's sensation, grip, and pinch of both median and ulnar nerves were intact, bilaterally. Dr. Kennedy diagnosed the following: bilateral flexor tendon tenosynovitis, work related; bilateral carpal tunnel syndrome, by clinical and positive nerve conduction study, work related; left cubital tunnel, by clinical but negative nerve conduction study, work related; bilateral ulnar nerve impingement at wrists, by clinical but negative nerve conduction study, work related; and possible rheumatoid arthritis versus fibromyositis. Dr.

9

Kennedy opined Plaintiff would remain on temporary total disability through August 30, 2004. He recommended Plaintiff have a "followup with both a neurologist as well as a rheumatologist." Dr. Kennedy noted he released Plaintiff from his care because she was not a candidate for surgery. He recommended she receive treatment from her primary care physician (R. 171).

On July 29, 2004, Cynthia Osborne, M.D., a state agency physician, completed a Physical Residual Functional Capacity Assessment of Plaintiff. Dr. Osborne found Plaintiff could occasionally lift and/or carry twenty pounds, frequently lift and/or carry ten pounds, stand and/or walk for a total of about six hours in an eight-hour workday, sit for a total of about six hours in an eight-hour workday, and push/pull unlimited (R. 143). Plaintiff was found to have occasional postural limitations (R. 144). Dr. Osborne found Plaintiff was limited in her fingering (fine manipulation) and no limitations in reaching, handling, or feeling. Plaintiff was found to have no visual or communicative limitations (R. 145-46). She found Plaintiff was unlimited in her exposure to extreme heat, wetness, humidity, noise, fumes, odors, dusts, gases, or poor ventilation. Plaintiff should avoid concentrated exposure to extreme cold and hazards and should avoid even moderate exposure to vibration (R. 146). Dr. Osborne reduced Plaintiff's RFC to light (R. 147).

On September 13, 2004, a Psychiatric Review Technique was completed on Plaintiff by a state agency physician. Plaintiff was found to have no medically determinable impairments, but was found to have coexisting nonmental impairments that required referral to another medical specialty, specifically, to neurology (R. 150).

On October 22, 2004, Plaintiff was evaluated by David E. Seaman, M.D., a rheumatologist. Plaintiff informed Dr. Seaman that she experienced fatigue, unrefreshed sleep, chronic recurrent headaches, and alternating diarrhea and constipation. Dr. Seaman's examinations of Plaintiff's

HEENT, heart, lungs, abdomen, skin, spine, hips, knees, ankles, and feet were normal. Plaintiff had multiple muscle tender points over all standard points examined. She had a positive Tinel's sign, bilaterally (R. 165). Dr. Seaman found Plaintiff's symptoms were consistent with fibromyalgia and that she had "[a]pparent chronic bilateral carpal tunnel syndrome." Dr. Seaman recommended Plaintiff be referred to physical therapy, undertake a NSAID trial, and obtain laboratory testing for "CBC, CR, LFT, TSH, calcium, magnesium, phosphorous and electrolytes for completeness sake," and a referral to neurology (R. 166).

On October 27, 2004, Dr. Kennedy spoke with Plaintiff relative to her use of Vicodin, expressing concern about Plaintiff's "dependence of med." Plaintiff stated she sometimes took one tablet of Vicodin daily or sometimes took six doses of the medication. Plaintiff stated if there were another medication that she could take that "would help her," she would treat her symptoms with that (R. 209).

On November 11, 2004, Dr. Kennedy filed an Interval Report of Plaintiff with the Worker's Compensation Division. Plaintiff reported to Dr. Kennedy that her symptoms had not changed and that she had been examined by Dr. Seaman, a rheumatologist, on October 22, 2004. Dr. Kennedy opined Plaintiff was "essentially unchanged from that of before. . . . " Plaintiff still showed evidence of positive median and ulnar nerve impingement at both wrists, with a positive Tinel's sign, wrist flexion test and compression test. Dr. Kennedy found Plaintiff had diffuse irritability throughout both hands and diminished grip and pinch strengths. Plaintiff, otherwise, had intact sensation and motor function (R. 167).

Dr. Kennedy's impressions were as follows: bilateral flexor tendon tenosynovitis, work related; bilateral carpal tunnel syndrome, by clinical and positive nerve conduction study, work

11

related; left cubital tunnel syndrome, by clinical but negative nerve conduction study, work related; bilateral ulnar nerve impingement at wrists, by clinical but negative nerve conduction study; work related; and possible rheumatoid arthritis versus fibromyalgia. Dr. Kennedy opined Plaintiff would remain on temporary total disability through January 31, 2005. Dr. Kennedy referred Plaintiff to Dr. Thomas Lauderman for Workers' Compensation follow ups until such time that Plaintiff could "have further management with her insurance company" (R. 168).

On March 5, 2005, Dr. Fulvio R. Franyutti, a state agency physician, completed a Physical Residual Functional Capacity Assessment of Plaintiff. Dr. Franyutti found Plaintiff could occasionally lift and/or carry twenty pounds, frequently lift and/or carry ten pounds, stand and/or walk for a total of about six hours in an eight-hour workday, sit for a total of about six hours in an eight-hour workday, and push/pull unlimited (R. 213). Dr. Franyutti opined Plaintiff was occasionally limited in her ability to climb, balance, stoop, kneel, crouch, or crawl (R. 214). Plaintiff was limited in her gross manipulation (handling), fingering (fine manipulation), and feeling (skin receptors), but was not limited in reaching (R. 215). Plaintiff was found to have no visual or communicative limitations (R. 215-16). Dr. Franyutti found Plaintiff was unlimited in her exposure to wetness, humidity, noise, fumes, odors, dusts, gases, and poor ventilation. Plaintiff should avoid concentrated exposure to extreme cold and heat, vibrations, and hazards (R. 216). Dr. Franyutti found Plaintiff was credible and that her allegations supported her disability. Dr. Franyutti found Plaintiff had bilateral carpal tunnel syndrome, residual paresthesias, pain, and weakness of her hand grip. Dr. Franyutti reduced Plaintiff's RFC to light (R. 212-17, 217).

On November 3, 2005, Claudette Brooks, M.D., examined Plaintiff at the WVU Neurology Clinic relative to her complaints of bilateral upper extremity weakness, pain, numbness, and tingling.

Plaintiff stated pain went "up her arm to her shoulder" and was 10/10. Plaintiff reported numbness and paresthesias in her left lower face and mouth and pain that radiated down her left buttocks into her left lower extremity. Plaintiff informed Dr. Brooks she had "knots in the back of her neck." Dr. Brooks' examination of Plaintiff revealed she was in no acute distress; her discs were sharp; she had no bruits; she was alert and oriented times three; her memory, attention, and knowledge were appropriate; she had no aphasia or dysarthria; her cranial nerves were intact except for "some subjective decreased facial sensation in the V2 and V3 regions of her face"; she had no taxia or dysmetria; her sensation was intact except for "some decreased vibration in the fingers and toes"; her Tinel's sign and Phalen's test were positive, but there was no rigidity; her strength was 5/5 bilaterally; she had giveaway weakness in her hands and wrists; and her reflexes were 2+ and symmetric (R. 260).

Dr. Brooks' assessment was for carpal tunnel syndrome with neuralgias and myalgias. Dr. Brooks opined Plaintiff had "tender points in the appropriate areas and several complaints" relative to fibromyalgia. Dr. Brooks ordered an EMG, MRI's and laboratory tests. Dr. Brooks prescribed Neurontin (R. 260, 262-68).

On November 8, 2005, an electromyography study was completed of Plaintiff. It showed "mild right carpal tunnel syndrome without evidence of a left radiculopathy" (R. 250, 317).

On November 17, 2005, a cervical spine MRI was completed of Plaintiff for her complaints of low back pain, neck pain and upper extremity pain (R. 252, 315). The MRI showed a disk protrusion at the C5-6 level, which resulted in mild to moderate spinal canal stenosis (R. 252-53, 315). A "solitary nodule within the left lobe of the thyroid" was found, which could have been indicative of the "high proteinaceous fluid." An ultrasound was recommended (R. 252, 315).

Also on November 17, 2005, Plaintiff underwent a MRI of her lumbosacral spine for complaints of neck and low back pain (R. 254-55, 314). The impression was for L5-S1 extruded disk with resulting mild spinal canal stenosis, "L5-S1 intervertebral disc space narrowing and end plate signal abnormalities with enhancement which may be related to a degenerative process or diskitis"; but no spinal canal stenosis at any other visualized levels. A "[c]orrelation with the [Plaintiff's] symptoms and a C. Reactive protein and sedimentation rate" was noted (R. 255, 314).

A third MRI was taken of Plaintiff on November 17, 2005, which showed an "unremarkable examination" of her thoracic spine (R. 256, 316).

On December 1, 2005, Plaintiff reported to Dr. Brooks that she had no changes in her condition from her previous examination, except that she had more neck pain and possible muscle spasms on November 14. Plaintiff informed Dr. Brooks that, four months earlier, during the birth of her child, she "had a difficult epidural placed, and her back has hurt . . . [and] she has noticed paresthesias in her lower thighs" since that time. Plaintiff was treating her conditions with Naproxen and Flexeril. Dr. Brooks' examination of Plaintiff revealed that she was in no acute distress; her discs were sharp; her blood pressure was 112/82; she had no bruits; she was alert and oriented; her memory, attention, and knowledge were all appropriate; she had no aphasia or dysarthria; her cranial nerves were intact; she had no ataxia; her Tinel's sign and Phalen's test were positive, but her sensation was intact with no rigidity; her strength was 5/5 bilaterally; her reflexes were 2+ in her upper extremities and 1+ in her lower extremities; and her sensation was intact to light touch and pinprick. Dr. Brooks reviewed Plaintiff's MRI results. She found possible diskitis of the lumbar spine; mild cervical stenosis; and a "clean" thoracic spine. Dr. Brooks opined Plaintiff did have disk protrusion at C5-C6 and moderate spinal canal stenosis; a nodule was found on her thyroid, which

14

should be treated by her primary care physician; and there were "questions of possible fibromyalgia." Dr. Brooks recommended Plaintiff consult an orthopedic physician for her possible diskitis (R. 257).

Also on December 1, 2005, Plaintiff was admitted overnight to the West Virginia University Hospital because she "was told that [she] needed to come be admitted." Plaintiff complained of low back pain, which radiated to her buttocks and into her back and shoulders and was worse when she lay flat or bent over partially (R. 279).

A MRI was made of Plaintiff's lumbosacral spine on December 2, 2005, while Plaintiff was a patient at West Virginia University Hospital. It was compared to the lumbosacral spine MRI of November 17, 2005. The impression was for degenerative changes at the L5/S1 level, with a broad-based disk bulge and superimposed disk herniation of extrusion type into the central canal. It caused "no significant central canal stenosis or neural foraminal stenosis." Extensive degenerative endplate changes were noted. The L4/L5 , L3/L4, and L1/L2 were unremarkable in appearances and the L2/L3 was normal in appearance (R. 301).

Plaintiff was released from West Virginia University Hospital on December 2, 2005, by Cauri Pawar, M.D., from the Department of Neurology, and Haider Chaudhry, M.D., a resident (R. 273-74, 276-77). Dr. Pawar diagnosed Plaintiff with low back pain and "carpal tunnel syndrome." Dr. Pawar prescribed Percocet, two tablets, every eight hours, for ten days. Dr. Pawar noted Plaintiff would follow up with Dr. Brooks; she would need a referral to the pain clinic; her activity level should return to "routine"; and Plaintiff could resume a regular diet. Plaintiff informed Dr. Pawar that she stopped medicating with Neurontin two weeks prior to her hospital admission because of weight gain and dry mouth. Dr. Pawar compared the December 2 MRI with the November 17 MRI and opined the changes were most consistent with arthritis. Plaintiff was discharged to home, with

independent ambulation, full self-care ability, and alert and oriented cognitive status (R. 273).

On January 21, 2006, Plaintiff presented to Sam Kuzbari, M.D., to establish care with him as her family doctor for treatment of her general health and for weight loss. Plaintiff stated she had "ongoing issues w/specialists" relative to her previous treatment for her conditions (lumbar arthritis, degenerative disc disease, fibromyalgia, and carpal tunnel). Plaintiff complained of lack of deep sleep, weight changes, muscle aches, numbness and tingling, and headaches (R. 243). Upon examination, Dr. Kuzbari found Plaintiff's spine was tender with radicular signs to her left hand and arm; low back tenderness at L4, L5, and S1; and twelve out of eighteen fibromyalgia points. Dr. Kuzbari's assessment was for cervical stenosis, chronic low back pain, obesity, and fibromyalgia (R. 245). He referred Plaintiff to physical therapy, recommended diet and exercise, and prescribed Orudis, Adipex, and Ultram (R. 245-48).

Plaintiff began physical therapy on January 23, 2006, for cervical stenosis and disc disease, as recommended by Dr. Kuzbari, with Mountain State Physical Therapy. She was scheduled to undergo therapy twice per week for four weeks (R. 328). Plaintiff attended physical therapy on January 25, 2006, and February 1, 2006 (R. 326-27).

On February 6, 2006, Brian D. Houston, M.D., a rheumatologist, examined Plaintiff. He found Plaintiff had fibromyalgia syndrome and sciatica (on the right) (R. 269). Dr. Houston's examination of Plaintiff revealed her vital signs were normal; the examination of her head, neck, eyes, ears, nose, and throat were normal; her thyroid gland was small; her carotid pulsations were normal and without bruits; she had no murmurs, gallops, or thrills; her abdomen was obese, but normal; her "MCPs and PIPs and wrists" were normal; she had full range of motion of her hips, neck, elbows, and shoulders; her back was "diffusely tender"; and her knees, ankles, and MTPs were

16

normal. ~~Dr. Houston opined Plaintiff had allodynia, with tender points of the lateral epicondyle of~~ both elbows; of the junction of the second rib and sternum, bilaterally; of C5, both left and right; of the left occipital; in the mid portion of the trapezius muscle, both left and right; overlying both SI joints; of both buttocks; of the trochanteric bursal, bilaterally; and of the medial fat pad of both knees. Plaintiff's leg raising test caused pain in her low back. Dr. Houston noted Plaintiff's December 2, 2005, MRI of her lumbar spine showed "broad-based disk bulge at L5-S1 as well as a superimposed disk herniation of the extrusion type in the midline. Neural foramen and central canal remained mildly patent. The extrusion extended along the posterior aspect of S1." Since Plaintiff reported that "physical therapy [was] hurting her," Dr. Houston recommended Plaintiff "talk to the Spine Clinic doctors to see what they would recommend" relative to her diagnosis of fibromyalgia. Dr. Houston recommended "regular exercise, either walking, exercise bicycle, or treadmill." Dr. Houston prescribed Amitriptyline and recommended Plaintiff stop medicating with Phentermine (R. 270).

On February 28, 2006, Beverly Epstein, M.D., Assistant Professor at the West Virginia University Hospital Spine Center and a member of the West Virginia University Department of Orthopaedics, completed a consultative examination of Plaintiff upon referral from Dr. Brooks. Plaintiff's chief complaints were back pain since 2005 and neck pain since 2003. Plaintiff sought diagnosis and treatment of her pain that radiated into all four extremities from her neck and back. Plaintiff reported she had back pain that was not diskitis; she had neck pain that was worse during her 2005 delivery of her youngest child; she had carpal tunnel, that was severe during her last pregnancy, but had "resolved or lessened after her pregnancy." Plaintiff stated that her neck and back pain was relieved by "walking somewhat"; medicating with Tramadol, Ketoprofen, and Motrin;

and treatment with heat and mineral ice. Plaintiff informed Dr. Epstein that her back and neck pain

was exacerbated by physical therapy, exercise, lifting her baby, sitting for any period of time,

bending, and lifting. Plaintiff stated she could walk ten to fifty feet "without any problem." Plaintiff

stated she was referred to the pain clinic and was told she would be treated there with "shots and she

was not interested" in participating in that treatment (R. 351).

Dr. Epstein reviewed and noted Plaintiff's November 8, 2005, EMG nerve conduction study

of her upper extremities, which showed "mild right carpal tunnel syndrome with no evidence of

radiculopathy"; Plaintiff's November 17, 2005, cervical spine MRI, which showed a C5-C6 focal

disk central and left paracentral protrusion and which caused mild neural foraminal and spinal

stenosis; Plaintiff's December 2, 2005, lumbosacral spine MRI, which showed degenerative disk

space narrowing at L5-S1, with protrusion in the midline and which did not cause any nerve root

compression; and Plaintiff's MRI of the thoracic spine, which was normal. Dr. Epstein also noted

Plaintiff's past medical history was "significant for fibromyalgia, carpal tunnel syndrome, and ulnar

neuropathy" (R. 351).

Plaintiff reported to Dr. Epstein that she had not worked since October 2003, due to her

"neck . . . bothering her." Plaintiff stated her hobbies were going to church and caring for her

children. Plaintiff informed Dr. Epstein she was "trying to seek Social Security disability for her

carpal tunnel syndrome," which Dr. Epstein observed was "mild by EMG at this point." Plaintiff

stated she was losing weight by taking Phentermine. Dr. Epstein's review of Plaintiff's systems

revealed negative gastrointestinal, HEENT, cardiac, pulmonary, skin, psych, allergies, hematology

examinations. During her neurological examination, Plaintiff complained of intermittent numbness

and tingling in all four extremities; she also stated she experienced "pressure-like headaches in the

temporal area." ~~Plaintiff's neck ranges of motion were within functional limits; however, Plaintiff~~ complained of pain with rotation, flexion and extension. Dr. Epstein found no clubbing, cyanosis, or edema. Plaintiff's pulses were "+2 throughout." Plaintiff's mental status was oriented and her cranial nerves were grossly intact. Plaintiff's motor strength was 5/5 throughout and sensation was intact to pinprick. Except for her ankles, Plaintiff's deep tendon reflexes were +2; her finger to nose and heel to shin examinations were within normal limits; and she walked with a mildly antalgic gait. Dr. Epstein found Plaintiff's low back examination revealed decreased lordosis, no kyphosis, and no scoliosis. Plaintiff complained of back pain on flexion and extension. Dr. Epstein found Plaintiff's SI joints, sciatic notch, ischial tuberosity, and all other spinous processes tender to palpation. Her straight leg raising test was "0-85 degrees with complaint of hamstring tightness" (R. 352).

Dr. Epstein's impression was for "mild degenerative disk disease of the lumbosacral spine at L5-S1, not causing any nerve root compression"; mild degenerative disk disease of the cervical spine at C5-C6; "SI dysfunction, right greater than left"; myofascial syndrome; decondition and probable depression (R. 352). Her plan of treatment was Lidoderm patch, home exercise program that included cervical exercises, "Kendall exercises," cervical traction, hip exercise, leg presses, buttock squeezes, shoulder blade squeezes, and walking program (R. 352-53). Dr. Epstein recommended Plaintiff wear closed shoes. She found Plaintiff was very deconditioned and that, in two months, Plaintiff would include abdominal crunches and "girl" pushups as part of her home exercise regimen. Plaintiff tried different seating arrangements during the examination, put she "did not like any of them" (R. 353). Dr. Epstein opined Plaintiff "should start feeling better within four to six months" if she followed the home exercise program (R. 350).

Worker's Compensation Division, of the AIG Claim Services, in Boston, MA (R. 331). Dr.

Kennedy reviewed Plaintiff's medical history and noted the following:

- Plaintiff's onset of left upper extremity and right hand symptoms occurred in 1992;

- Plaintiff had endoscopic left carpal tunnel release in January, 1992, but realized no relief;

- Plaintiff had open carpal tunnel release in October, 1992, due to continued symptoms, and realized "slightly better improvement" if she avoided repetitive activities;

- Plaintiff experienced a return of symptoms to her left and early symptoms to her right hands in 1994;

- Plaintiff had numbness, tingling, and burning pain in her left wrist, elbow and shoulder, right wrist pain that radiated to the right neck and shoulder, and minimal nocturnal complaints and hand swelling in October, 2003;

- Plaintiff's examination by Dr. Kelley, her original hand surgeon, on October 22, 2003, who noted Plaintiff had been treated with prednisone, Vioxx, hydrocodone, and oxycodone during a hospital emergency department visit and who diagnosed "possible recurrent carpal tunnel on the left and possible carpal tunnel on the right";

- Plaintiff's bilateral EMG nerve conduction study, which was found to be normal;

- Dr. Kelley's October 29, 2003, recommendation that Plaintiff undergo re-operation for her symptoms;

- The November 20, 2003, opinion of Dr. Kirk Watson, who found Plaintiff had major thenar weakness in the right hand, had only minor thenar weakness on the left, had no carpal tunnel on the left, had left ulnar nerve impingement at the cubital level, and was having difficulties with "driving, grooming, opening jars, using a phone, or reading in typical fashion," and who recommended right carpal tunnel release and possible left upper extremity surgical decompensation;

- His own February 19, 2004, examination of Plaintiff and his opinion she had findings consistent with ongoing flexor tendon tenosynovitis, bilateral carpal tunnel syndrome, left cubital tunnel syndrome, and possible fibromyalgia;

- Plaintiff's February 28, 2004, repeat bilateral nerve conduction study, which

indicated bilateral carpal tunnel, but not ulnar nerve conduction;

- His own February 28, 2004, observation of atrophy of Plaintiff's abductor pollicis brevis muscles in both thenar areas, which indicated possible side effects of median nerve impingement;

- Plaintiff's March 11, 2004, cortisone injections to her left cubital tunnel, both carpal tunnels, and ulnar nerve impingements at the wrists;

- His own April 7, 2004, examination of Plaintiff wherein he found Plaintiff had "no improvement whatsoever" of her symptoms from the injections, had nocturnal and daytime pain, had numbness and tingling, had positive Tinel's sign, positive compression test, positive wrist flexion test of the median and ulnar nerves, positive roll sign for the left ulnar nerve at the cubital tunnel, and irritability with repetitive use of hands;

- His own April 7, 2004, findings that he considered Plaintiff had fibromyalgia, due to finding tenderness and irritability throughout Plaintiff's forearm and upper muscles, facial nerve irritability and numbness, and his recommendation she be examined by a rheumatologist and neurologist;

- His May 27, 2004, findings that Plaintiff's physical examinations were unchanged, except that she had increased edema in the volar and wrist compartments;

- His finding Plaintiff had no change in her clinical status on July 14, 2004;

- Dr. Seaman's October 22, 2004, evaluation of Plaintiff, at which time he found widespread myalgia, fatigue, chronic recurrent headaches, no thenar atrophy, no gross motor or sensory deficits, multiple muscle tender points and opined his findings were consistent with fibromyalgia syndrome and chronic bilateral carpal tunnel syndrome;

- His November 11, 2004, evaluation that Plaintiff was unchanged and that her physical findings showed minimal grip and pinch, positive signs of nerve impingement, and diffuse tenderness;

- Dr. Brooks' November 2, 2005, opinion that Plaintiff was positive for right carpal tunnel but negative for left;

- Dr. Epstein's recommendation of physical therapy and exercises for back pain; and

- Dr. Houston's February 2, 2006, diagnosis of fibromyalgia, for which he treated Plaintiff with Amitriptyline and from which she realized "minimal improvement" (R. 331-36).

Dr. Kennedy noted Plaintiff was treating her symptoms with Amitriptyline, Tramadol,
Ketoprofen, and Phentermine (for weight loss) (R. 336). Dr. Kennedy found all Plaintiff's systems were normal upon examination, except for musculoskeletal, for which he noted Plaintiff "had a firm diagnosis of fibromyalgia and previous bilateral carpal tunnel" (R. 337). Dr. Kennedy noted Plaintiff's current complaints were as follows: bilateral volar wrist pain, spontaneously or with repetitive activity; shooting pains in her left hand to the forearm, spontaneously or with repetitive activity; constant numbness and tingling in both hands in the median and ulnar nerve distributions; cramping in both hands with any extended use; cramping into the forearm muscles; dropping items from both hands; poor grip and pinch in both hands; no endurance in doing any tasks with her hands; inability to write anything more than the address on an envelope; difficulty holding onto small items, such as a pen, pencil, or tweezer; no nocturnal symptoms now; and slept through the night with the aide of medication (R. 338).

Dr. Kennedy's examination of Plaintiff's neck was normal. Plaintiff's examination for muscle spasm, tenderness, and trigger points was negative (R. 339). Plaintiff's shoulder and elbow examinations showed normal results. Plaintiff's right wrist flexion was fifty degrees and left was thirty-five degrees; wrist extensions were fifty degrees on the right and forty degrees on the left; wrist ulnar deviations were thirty degrees on the right and fifteen on the left; and wrist radial deviations were ten degrees on the right and fifteen on the left. Plaintiff's left and right dorsal and volar were positive for edema (R. 340). Plaintiff's finger and thumb ranges of motion were normal (R. 341). Dr. Kennedy observed and opined Plaintiff's pinch and grip efforts were "not those to be expected for a patient of her age, occupation and body build." Plaintiff's grips were "15-15-15-10-10" on the right and "25-20-20-15-15" on the left; normal grip strength was sixty-five pounds on the dominant

22

right hand and sixty pounds on the non-dominant left hand. Dr. Kennedy opined the "diminishment of grip and pinch is on the basis of a combination of both nerve impingements to the median and ulnar nerves bilaterally at the wrist as well as overlying fibromyositis." Plaintiff's left and right Tinel's tests for the median and ulnar wrists were positive (R. 342). Plaintiff's median and ulnar wrist Phalen's tests were positive, both right and left, and her wrist compression tests, both left and right and ulnar and median, were positive. Plaintiff's intrinsic muscle testing and Allen's test were intact. Plaintiff's wrist stability tests were negative (R. 343). Plaintiff's motor sensory tests for nerve intactness, provocative tests for thoracic outlet syndrome, and crepitus tests were all negative. Plaintiff's neurologic exam was "grossly physiologic" (R. 344).

Dr. Kennedy's March 15, 2006, impressions were for bilateral flexor and extensor tendon tenosynovitis, work related and secondary to fibromyalgia; bilateral carpal tunnel syndrome, by clinical but negative [sic] nerve conduction study criteria, work related; left cubital tunnel, by clinical but negative nerve conduction study, work related and resolved; bilateral ulnar nerve impingement at wrists, by clinical but negative nerve conduction study, work related; and fibromyalgia (R. 344). Dr. Kennedy then summarized the medical information as to Plaintiff's injury and listed his and other physicians' conclusions (see above) (R. 345-46). Dr. Kennedy opined Plaintiff was not considered permanent and stationary from the October 2, 2003, injury and continued on temporary total disability through June 30, 2006 (R. 346).

Dr. Kennedy summarized his pertinent positive findings as follows: diminished range of motion of left wrist in flexion and extension as compared to right hand; diminished grip and pinch strengths in both hands, secondary to previous ongoing nerve impingements; positive Tinel's sign for median nerves at both wrists; positive Tinel's sign for the left ulnar nerve at the wrist; positive

compression test to the median and ulnar nerves at both wrists; positive wrist flexion test for median and ulnar irritability at both wrists; atrophy of bilateral thenar muscles, specifically the abductor pollicis brevis muscles, more in the right hand; and diffuse tenderness throughout all muscle groups of hands and forearms, which was indicative of fibromyalgia (R. 346). Dr. Kennedy opined Plaintiff qualified for a twenty-percent impairment of the left upper extremity for grip and a twenty-percent impairment of the upper extremity for pinch (R. 347). Dr. Kennedy found Plaintiff's whole person impairment was twenty-nine percent. Dr. Kennedy noted Plaintiff elected to proceed with medical management as prescribed for fibromyalgia by the rheumatologist (R. 348).

Dr. Kennedy found Plaintiff should undergo a neurological evaluation to determine the necessity for surgery. At the request of Plaintiff's attorney, Dr. Kennedy made a work capacity evaluation of Plaintiff, in which he found Plaintiff had fatigue, lack of endurance, and poor grip and pinch, which would cause Plaintiff to "be able to do little in the way of any repetitive activity and may well be considered permanently disabled to be eligible for social security benefits." Dr. Kennedy opined Plaintiff would not "be able to return to the active work force at any time in the near future" and that Plaintiff would "be left with the appropriate residual disabilities commensurate with both her Workman's Compensation injuries of the nerve impingement followed by the overlying problem of her fibromyalgia" (R 348). Dr. Kennedy claimed he based all his opinions on the personal history provided to him by Plaintiff, his detailed physical examination of Plaintiff, his review of Plaintiff's pertinent medical records and diagnostic studies, his understanding of Plaintiff's work duties, and his understanding of the condition and prognosis of the injury (R. 349).

Administrative Hearing

At the March 14, 2006, administrative hearing, held in Morgantown, West Virginia,

24

Plaintiff's counsel informed the ALJ that Plaintiff was scheduled to undergo a physical examination by Dr. Kennedy on March 15, 2006, relative to her carpal tunnel symptoms (R. 357-58). Plaintiff's counsel also informed the ALJ that Plaintiff had been evaluated by Dr. Epstein on February 28, 2006, and the report was not yet part of the record (R. 358). The ALJ left the record open for two weeks, post hearing, in order for those medical reports to be submitted to her for her review (R. 381-82).

Plaintiff testified at the hearing that she drove rarely and possibly up to three miles per week. She stated she drove to doctors' offices, to the pharmacy, and to the grocery store (R. 360). Plaintiff also testified that she would drive to the Middletown Mall from her home in Fairmont to walk and that she had driven herself to the administrative hearing (R. 361). Plaintiff testified that the symptoms that kept her from being able to work were as follows: hand cramps when attempting to write; hand numbness and tingling; dropping items; neck pain; and fibromyalgia (R. 364). Plaintiff stated her husband shopped for groceries, laundered the clothes, vacuumed and did the majority of house cleaning (R. 367-68). Plaintiff stated she cooked macaroni and cheese and made sandwiches for her daughter and would launder some of her baby's clothes. She testified that she received help completing domestic chores from family members, such as her mother in law. Plaintiff stated she could complete personal hygiene tasks on her own, but she did not wash her hair daily "because it's too much" as she was "too achy . . . to do it" (R. 367). Plaintiff stated she attended church and occasionally dined at her mother-in-law's house and visited her sister- and grandmother-in-law. Plaintiff stated she played with her young children (R. 368).

Plaintiff testified that she would have to lie down after she carried an object due to pain (R. 368). Plaintiff stated she experienced back and neck pain as she sat in the hearing room. Plaintiff testified she felt as though her head were heavy and she had difficulty "holding it up" (R. 369).

Plaintiff stated she could walk for "a couple minutes," sit for ten minutes "or so," and stand for thirty seconds. Plaintiff testified she lay down four or five times each day. Amitriptyline made her "groggy" (R. 371). Plaintiff testified her pain level was normally a seven, a five on a "really good day," and a ten on a bad day and that, in a week-long period, she experienced one really good day, two really bad days, and the remainder were "in between" (R. 373).

During questioning by her lawyer, Plaintiff testified that both hands were numb, ached, had shooting pains, and cramped (R. 373). Plaintiff stated it was more difficult for her to hold small items than it was for her to hold large items (R. 374).

The ALJ posed the following hypothetical question to the VE:

> If you take a hypothetical person of the claimant's age, background, education and work experience who could do a range of light work with occasional postural, with a sit/stand option. Some decrease in the grip strength in each hand and arm. Some decrease or limited use of fine manipulation in each hand, primarily the right hand, which is her dominant hand. Needs to avoid extremes of cold and heat, needs to avoid hazardous machinery and heights, vibrations and something that would require little writing. I'm going to add some decrease or some limitation in the use of the neck and shoulders above the level of her shoulders, arms above the level of her shoulders. . . . What about any jobs in the economy that such a person might be able to do? (R. 377-78).

The VE found Plaintiff could perform the following light exertional work: parking lot attendant, 85,000 nationally and 1,000 regionally, which was reduced to half due to decreased grip strength, fine manipulation, and sit/stand option; hotel/motel clerk, 159,000 nationally and 3,7000 regionally, which was reduced to half due to the sit/stand option and the decreased fine manipulation; information clerk, 297,000 nationally and 3,000 regionally, which was reduced to half due to the sit/stand option (R. 378-79). At the sedentary level, the VE found Plaintiff could perform the work of a surveillance monitor, 97,000 nationally and 1,900 regionally; dispatcher, 272,000 nationally and 2,900 regionally; election clerk, 55,000 nationally and 1,200 regionally (R. 379-80). The VE

~~affirmed that a person who was off task more than twenty percent of the time would not be able to~~

function in the economy.  Upon questioning by Plaintiff's counsel, the VE affirmed that a person

who had "no use of their [sic] hands in the performance of the job, gross or fine manipulation of any

kind in performance of the work" would not be able to perform the jobs he listed (R. 380-81).

### III.  Administrative Law Judge Decision

Utilizing the five-step sequential evaluation process prescribed in the Commissioner's

regulations at 20 C.F.R. §§ 404.1520 and 416.920,  ALJ Cannon made the following findings:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2008.

2. The claimant has not engaged in substantial gainful activity at any time relevant to this decision (20 CFR 404.1520(b), 404.1571, *et seq.*, 401.920(b) and 416.971 *et seq.*).

3. The claimant has the following severe impairments: the claimant's mild degenerative disc disease of the lumbosacral and cervical spine, mild right carpal tunnel syndrome, and SI dysfunction and myofascial syndrome, when combined are severe.

4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to [sic] light work with a sit/stand option; allows some decrease in grip strength in arms and hands; some decrease in fine manipulation, primarily the right dominant hand; needs to avoid extremes of cold, heat, hazardous machinery, heights, vibrations; work should require only minimal writing; and limited use of neck and arms above shoulder level.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7. The claimant was born on June 15, 1964, and was 39 years old on the alleged disability onset date, which is defined as a younger individual 18-44 (20 CFR 404.1563 and 416.963).

8. ~~The claimant has at least a high school education and is able to communicate in~~ English (20 CFR 404.1564 and 416.964).

9. Transferability of job skills is not material to the determination of disability due to the claimant's age (20 CFR 404.1568 and 416.968).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1560(c), 404.1566, 416.960(c), and 416.966).

11. The claimant has not been under a "disability," as defined in the Social Security Act, from October 8, 2003, through the date of this decision (20 CFR 404.1520(g) and 416.920(g) (R. 14-21).

## IV. Discussion

### A. Scope of Review

In reviewing an administrative finding of no disability the scope of review is limited to determining whether "the findings of the Secretary are supported by substantial evidence and whether the correct law was applied." *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). Elaborating on this definition, the Fourth Circuit has stated that substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a jury verdict were the case before a jury, then there is 'substantial evidence.'" *Shively v. Heckler*, 739 F.2d 987, 989 (4th Cir. 1984) (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1968)). In reviewing the Commissioner's decision, the reviewing court must also consider whether the ALJ applied the proper standards of law: "A factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

28

The Plaintiff contends:

1.    The ALJ erred by not considering a sixteen page treating physician's report when the case law, the regulations and the Social Security rulings require that the ALJ make specific findings as to what weight she is assigning the treating physician's opinion pursuant to SSR 96-2p.

2.    The ALJ improperly evaluated the claimant's testimony of pain and limitations by finding that her testimony was inconsistent with her daily activities which violates SSR 96-2p and the most recent Fourth Circuit precedent.

The Commissioner contends:

1.    Substantial evidence supports the Commissioner's finding that Plaintiff could perform a limited range of light work and, therefore, was not disabled.

### C. Treating Physician

Plaintiff contends the ALJ erred by not considering a March 15, 2006, medical report by her treating physician in conformance with existing case law, regulations, and Social Security rulings, which require the ALJ to make specific findings as to what weight she is assigning to the treating physician's opinion, pursuant to SSR 96-2p. Defendant contends substantial evidence supports the Commissioner's finding that Plaintiff could perform a limited range of light work.

SSR 96-2p mandates, in part, the following:

Controlling weight. This is the term used in 20 CFR 404.1527(d)(2) and 416.927(d)(2) to describe the weight we give to a medical opinion from a treating source that must be adopted. The rule on controlling weight applies when all of the following are present:

1.    The opinion must come from a "treating source," as defined in 20 CFR 404.1502 and 416.902. Although opinions from other acceptable medical sources may be entitled to great weight, and may even be entitled to more weight than a treating source's opinion in appropriate circumstances, opinions from sources other than treating sources can never be entitled to "controlling weight."

2.    The opinion must be a "medical opinion." Under 20 CFR 404.1527(a) and

29

416.927(a), "medical opinions" are opinions about the nature and severity of an individual's impairment(s) and are the only opinions that may be entitled to controlling weight. (See SSR 96-5p, "Titles II and XVI: Medical Source Opinions on Issues Reserved to the Commissioner.")

3. The adjudicator must find that the treating source's medical opinion is "well-supported" by "medically acceptable" clinical and laboratory diagnostic techniques. The adjudicator cannot decide a case in reliance on a medical opinion without some reasonable support for the opinion.

4. Even if well-supported by medically acceptable clinical and laboratory diagnostic techniques, the treating source's medical opinion also must be "not inconsistent" with the other "substantial evidence" in the individual's case record.

If any of the above factors is not satisfied, a treating source's opinion cannot be entitled to controlling weight. It is an error to give an opinion controlling weight simply because it is the opinion of a treating source if it is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or if it is inconsistent with the other substantial evidence in the case record. However, when all of the factors are satisfied, the adjudicator must adopt a treating source's medical opinion irrespective of any finding he or she would have made in the absence of the medical opinion.

In the ALJ's decision, she evaluated the opinions of Dr. Kennedy, as follows:

Thomas J. Kennedy, III, M.D., a hand surgeon specialist evaluated the claimant on April 7, 2004, and concluded that the claimant was not a candidate for further surgery. He recommended that the claimant be evaluated by a neurologist and rheumatologist due to suspicion of overlying problems other than carpal tunnel. (Exhibit 6F) (R. 17).

As for the opinion evidence, on March 11, 2004, Dr. Kennedy opined that the claimant was temporarily totally disabled until April 30, 2004. On April 14, 2004, Dr. Kennedy opined that the claimant was unable to return to modified or alternative work due to excessive symptoms; however, he felt that the claimant would be near maximum medical improvement on or after August 1, 2004. At each subsequent visit, Dr. Kennedy extended that claimant's disability until January 31, 2005. (Exhibit 6F) (R. 19).

This opinion is not afforded great weight, as Dr. Kennedy fails to describe what work-related limitations that the claimant has. In addition, the issue of disability is reserved for the Commissioner (R. 19).

The ALJ is correct in his decision that the opinions of Dr. Kennedy relative to Plaintiff's

being disabled are issues of disability and are reserved for the Commissioner. SSR 404.1527(e)(1)

expressly provides that the Commissioner "will not give any special significance to the source of an

opinion on issues reserved to the Commissioner"; specifically, "a statement by a medical source that

you are 'disabled' or 'unable to work' does not mean that [the ALJ] will determine that you are

disabled." Such opinions, therefore, cannot be accorded controlling weight or even any special

significance. Dr. Kennedy did not, however, express opinions only as to Plaintiff's level and length

of disability. Dr. Kennedy provided opinions about Plaintiff's physical conditions and limitations,

which were not considered or evaluated by the ALJ and to which the ALJ did not assign weight.

> Paragraph (d)(2) of 20 CFR 404.1527 and 416.927 requires that the adjudicator will
> always give good reasons in the notice of the determination or decision for the weight
> given to a treating source's medical opinion(s), i.e., an opinion(s) on the nature and
> severity of an individual's impairment(s). Therefore:
>
> > When the determination or decision:
> > > is not fully favorable, e.g., is a denial; or . . .
> > > the notice of the determination or decision must contain specific reasons
> > > for the weight given to the treating source's medical opinion, supported
> > > by the evidence in the case record, and must be sufficiently specific to
> > > make clear to any subsequent reviewers the weight the adjudicator gave
> > > to the treating source's medical opinion and the reasons for that weight.

The ALJ's analysis of evidence from Dr. Kennedy does not contain specific reasons for the

weight she assigned to those opinions. Most notably, the ALJ does not assess, evaluate, or weigh

the opinions and diagnoses of Dr. Kennedy in accord with SSR 96-2p.

As noted in the above recited analysis by the ALJ of Dr. Kennedy's medical opinions, the

ALJ did not consider the March 15, 2006, report of Dr. Kennedy, even though she informed

Plaintiff's counsel at the administrative hearing that she would hold the record open for two weeks

for receipt of that report because she had noted that Plaintiff was going to be examined the following

day by Dr. Kennedy for a rating on her carpal tunnel and ulnar nerve syndrome, and she thought the

report on that evaluation "would be helpful" (R. 357-58, 382). In addition to not considering Dr.

Kennedy's March 15, 2006, report, the ALJ failed to adequately evaluate the previous seven reports

provided by Dr. Kennedy.

It is undisputed that Dr. Kennedy was Plaintiff's treating physician for one year for her carpal

tunnel and ulnar nerve syndromes. 20 CFR 404.1520 defines "treating source" as follows:

> *Treating source* means your own physician, psychologist, or other acceptable medical
> source who provides you, or has provided you, with medical treatment or evaluation
> and who has, or has had, an ongoing treatment relationship with you. Generally, we
> will consider that you have an ongoing treatment relationship with an acceptable
> medical source when the medical evidence establishes that you see, or have seen, the
> source with a frequency consistent with accepted medical practice for the type of
> treatment and/or evaluation required for your medical condition(s). We may consider
> an acceptable medical source who has treated or evaluated you only a few times or
> only after long intervals (e.g., twice a year) to be your treating source if the nature
> and frequency of the treatment or evaluation is typical for your condition(s). We will
> not consider an acceptable medical source to be your treating source if your
> relationship with the source is not based on your medical need for treatment or
> evaluation, but solely on your need to obtain a report in support of your claim for
> disability. In such a case, we will consider the acceptable medical source to be a
> nontreating source.

Dr. Kennedy provided medical treatment and evaluated Plaintiff in an ongoing manner starting on

February 19, 2004, and continuing on March 11, 2004; April 7, 2004; April 14, 2004; May 27, 2004;

July 14, 2004; November 11, 2004; and March 15, 2006 (R. 194, 207, 211, 186, 190, 182, 181, 174,

170, 167, 331). On those dates, he examined Plaintiff, treated Plaintiff, and/or offered medical

opinions as to Plaintiff's impairments; however, except for remarking on Dr. Kennedy's April 7,

2004, opinion that Plaintiff was not a candidate for surgery and recommendation she should be

evaluated by a neurologist and rheumatologist for "suspicion of overlying problems other than carpal

tunnel" and opinions about Plaintiff's being disabled for certain time periods, the ALJ did not

discuss the nature and extent of the treatment relationship between Dr. Kennedy and Plaintiff; the

32

ALJ did not discuss if the relevant clinical and laboratory diagnostic evidence, or possible lack thereof, that supported Dr. Kennedy's opinions; and the ALJ did not discuss whether Dr. Kennedy's opinions were consistent with the record as a whole (R. 17, 19).

The ALJ failed to consider Dr. Kennedy's opinions about the nature and severity of Plaintiff's impairments. On February 19, 2004, Dr. Kennedy found Plaintiff had a positive Phalen's sign; inflammation of the right median nerve; atrophic thenar muscles on the right; sensitivity along the left ulnar nerve; major thenar weakness in the right hand; left ulnar nerve impingement at the cubital level; positive elbow flexion for ulnar nerve paresthesias; abnormal flexion, extension, ulnar deviation and radial deviation of the wrists; positive volar edema; significant atrophy of the abductor pollicis brevis muscles on the right; positive Tinel's test; and positive compression test to the median and ulnar nerves (R. 194, 196, 199-200, 202, 205). Dr. Kennedy found Plaintiff had diminished grip and pinch strengths, bilaterally (202, 205) He diagnosed Plaintiff with bilateral flexor tendon tenosynovitis, left carpal tunnel syndrome, left cubital tunnel syndrome, and bilateral ulnar nerve impingement at the wrists (R. 204).

The ALJ failed to consider Dr. Kennedy's March 11, 2004, opinion that Plaintiff's symptoms had remained unchanged or that Dr. Kennedy treated Plaintiff for her symptoms with cortisone injections to her carpal tunnel spaces, ulnar nerve compartments, and left cubital tunnel (R. 186-87, 189). The ALJ failed to consider or evaluate Dr. Kennedy's April 7, 2004, opinions that Plaintiff's conditions and his examination results were unchanged; that she experienced no "improvement whatsoever following the[] injections," but had developed "irritability, discomfort, and pain in both . . . upper extremities"; or that he prescribed Vicodin for pain relief (R. 182-83). The ALJ did not consider or evaluate Dr. Kennedy's May 27, 2004, opinion that Plaintiff's conditions and his

examination results were unchanged even though she had been treated conservatively with cortisone

injections; his opinion that Plaintiff was positive for multiple trigger points in her forearms, upper

arms, and neck; and that he continued the prescription of Vicodin as treatment for Plaintiff's pain

(R. 174-75). The ALJ did not address Dr. Kennedy's July 14, 2004, opinion that Plaintiff's

conditions and his examination results were unchanged, except Plaintiff experienced ongoing

numbness and tingling in her hand, pain in her wrists and forearms, and muscle spasms (R. 170-71).

Even though Dr. Kennedy released Plaintiff from his care on July 14, 2004, and recommended she

seek treatment for her condition with her primary care doctor, Plaintiff returned to his care on

November 11, 2004 (R. 171, 167). On that date, Dr. Kennedy opined Plaintiff was "essentially

unchanged from that of before . . ." and that her median and ulnar nerve impingement symptoms

were positive and her Tinel's sign, wrist flexion test, and compression test were positive. The ALJ

did not acknowledge these opinions (R. 167-68).

The ALJ did not consider, evaluate, or weigh Dr. Kennedy's March 15, 2006, opinions and

findings. On that date, Dr. Kennedy completed an extensive history and examination of Plaintiff.

He reviewed all of Plaintiff's past medical records relative to her bilateral flexor tendon

tenosynovitis, left carpal tunnel syndrome, left cubital tunnel syndrome, bilateral ulnar nerve

impingement at the wrists, low back pain and fibromyalgia (R. 331-3). Dr. Kennedy performed

examinations of Plaintiff's neck, shoulders, elbows, wrists, hands, and fingers. Dr. Kennedy found

that Plaintiff's pinch and grip efforts were "not those to be expected for a patient of her age,

occupation and body build" because a normal grip strength was sixty-five pounds on the dominant

and sixty pounds on the non-dominant hand, but Plaintiff's grips were 15-15-15-10-10 pounds on

the right and 25-20-20-15-15 pounds on the left. He opined Plaintiff's "diminishment of grip and

pinch is on the basis of a combination of both nerve impingements to the median and ulnar nerves

bilaterally at the wrist as well as overlying fibromyositis" (R. 342). Dr. Kennedy opined, in the

March 15, 2006, report that Plaintiff had diminished range of motion of her left wrist in both flexion

and extension; positive Tinel's sign for median nerves at both wrists; positive Tinel's sign for the

left ulnar nerve at the wrist; positive compression test to the median and ulnar nerves at both wrists;

positive wrist flexion test for median and ulnar irritability at both wrists; atrophy of bilateral thenar

muscles, specifically the abductor pollicis brevis muscles; and diffuse tenderness throughout all

muscle groups of her hands and forearms, which was indicative of fibromyalgia (R. 346). Dr.

Kennedy opined Plaintiff had a twenty-percent impairment of the left upper extremity for grip and

a twenty-percent impairment of the upper extremity for pinch (R. 347). Based on the entire

examination and his findings therefrom, Dr. Kennedy opined Plaintiff's impairments were as

follows: fatigue, lack of endurance, poor grip, and poor pinch which would cause Plaintiff to not "be

able to do little in the way of any repetitive activity" (R. 349). Dr. Kennedy found Plaintiff's

limitations would continue and be "commensurate" with the nerve impingement, the result of her

Workman's Compensation injury, and impacted by fibromyalgia (R. 348). The ALJ did not evaluate

or weigh these opinions of Dr. Kennedy. In not analyzing Dr. Kennedy's findings and opinions, the

ALJ did not adopt or reject Plaintiff's possible inability to perform jobs that required repetitive

activity in her RFC or hypothetical to the VE.

Additionally, the ALJ did not make findings that the opinions of Dr. Kennedy were supported

by medically acceptable clinical and laboratory diagnostic techniques. The February 28, 2004,

electromyography showed bilateral carpal tunnel syndrome and numbness in ulnar distribution (R.

191,193, 323, 325). Additionally, the November 8, 2005, electromyography study showed "mild

Finally, the ALJ did not make a determination that Dr. Kennedy's medical opinion were or were not inconsistent with the other "substantial evidence" of record. Dr. Kennedy treated Plaintiff for bilateral flexor tendon tenosynovitis, left carpal tunnel syndrome, left cubital tunnel syndrome, bilateral ulnar nerve impingement at the wrists; however, Plaintiff was evaluated by other physicians relative to her conditions. On November 20, 2003, Dr. Watson examined Plaintiff and diagnosed "significant carpal tunnel syndrome right with major thenar weakness" (R. 127-28). Dr. Seaman opined on October 22, 2004, that Plaintiff had "[a]pparent chronic bilateral carpal tunnel syndrome" (R.166). Dr. Franyutti, a state agency physician, opined on March 5, 2005, that Plaintiff was limited in her gross manipulation (handling), fingering (fine manipulation), and feeling (skin receptors). He found Plaintiff was credible and that her allegations supported her disabilities of bilateral carpal tunnel syndrome, residual paresthesias, pain, and weakness of her hand grip (R. 212-17). Dr. Brooks, on November 3, 2005, found that Plaintiff's Tinel's sign and Phalen's test were positive and she had giveaway weakness in her hands and wrists. She diagnosed carpal tunnel syndrome with neuralgias and myalgias (R. 260, 262-68).

In *Craig v. Chater*, 76 F.3d 585, 590(4th Cir. 1996), the Fourth Circuit held:

Circuit precedent does not require that a treating physician's testimony "be given controlling weight." *Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992). In fact, 20 C.F.R. §§ 404.1527(c)(2) and 416.927(d)(2) (emphasis added) both provide,

> [i]f we find that a treating source's opinion on the issue(s) of the nature and severity of [the] impairment(s) is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record, we will give it controlling weight.

[4,5] By negative implication, if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded

"Although it is not binding on the Commissioner, a treating physician's opinion is entitled to great weight and may be disregarded only if persuasive contradictory evidence exists to rebut it." *Craig, id.* at 589. The treating physician's opinion should be accorded great weight because "it reflects an expert judgment based on a continuing observation of the patient's condition over a prolonged period of time." *Mitchell v. Schweiker*, 699 F.2d 185 (4th Cir. 1983).

This Court is not expressing an opinion as to whether or not Plaintiff is disabled within the meaning of the regulations. The undersigned finds the ALJ erred in his assessment of Plaintiff's treating physician's opinions. The ALJ did not make a determination that the opinions, findings, and diagnoses of Dr. Kennedy, who treated Plaintiff for bilateral flexor tendon tenosynovitis, left carpal tunnel syndrome, left cubital tunnel syndrome, bilateral ulnar nerve impingement at the wrists, revealed the nature and severity of Plaintiff's impairments and limitations; were or were not well supported by medically acceptable clinical and laboratory diagnostic techniques; and were or were not inconsistent with the other substantial evidence in the case record. For these reasons, the undersigned finds substantial evidence does not support the ALJ's finding relative to the medical evidence of Dr. Kennedy.

### D. Credibility

Plaintiff next argues that the ALJ improperly evaluated Plaintiff's testimony of pain and limitations by finding that her testimony was inconsistent with her daily activities, which violates SSR 96-2p and the most recent Fourth Circuit precedent.[2] Defendant contends substantial evidence

---

[2]Plaintiff refers to SSR 96-2p as the controlling regulation for assessment of credibility; however, SSR 96-2p does not contain policy regarding credibility. SSR 96-2p is the regulation that mandates the criteria and policy for assigning controlling weight to treating source medical

supports the Commissioner's finding that Plaintiff could perform a limited range of light work and,

therefore, was not disabled and that since the ALJ "considered her allegations regarding her impairments and . . . assessed their credibility in the context of all of the other evidence before him [sic], the ALJ's determination that Plaintiff's impairments would not render her disabled from all work is supported by substantial evidence" (Defendant's brief at p. 11).

In *Craig,* the Fourth Circuit described the factors an ALJ is required to consider in making the pain and credibility determination as follows:

> Under the regulations, this evaluation must take into account not only the claimant's statements about her pain, but also "all the available evidence," including the claimant's medical history, medical signs, and laboratory findings, *see id.;* any objective medical evidence of pain (such as evidence of reduced joint motion, muscle spasms, deteriorating tissues, redness, etc.). *See* 20 C.F.R. §§ 416.929(c)(2) & 404.1529(c)(2); and any other evidence relevant to the severity of the impairment, such as evidence of the claimant's daily activities, specific descriptions of the pain, and any medical treatment taken to alleviate it. *See* 20 C.F.R. § 416.929(c)(3) & 404.1529(c)(3).

*Craig, supra* at 594. Additionally, SSR 96-7p provides:

> 4. In determining the credibility of the individual's statements, the adjudicator must consider the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and any other relevant evidence in the case records. An individual's statements about the intensity and persistence of pain or other symptoms or about the effect the symptoms have on his or her ability to work may not be disregarded solely because they are not substantiated by objective medical evidence.

The ALJ's credibility analysis in this case, in its entirety, is as follows:

> After considering the evidence of record, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to produce the alleged symptoms, but that the claimant's statements concerning the intensity,

---

opinions. SSR 96-7p is that regulation that provides mandates for evaluating credibility.

The claimant used her hands expressively throughout the hearing. She is able to take care of her personal needs and hygiene. She cares for two children, one of which [sic] is two years old. She does some cooking and laundry. She attends church and visits relatives. The claimant alleged that she could stand for only 30 seconds in one spot and sit for only 10 minutes; however, she did not display signs of discomfort during the hearing (R. 19).

The ALJ did not assess Plaintiff's credibility "in the context of all of the other evidence before him [sic]," as asserted by Defendant (Defendant's brief at p. 11), because, as earlier found by the undersigned, the ALJ did not consider the medical opinions and findings of Dr. Kennedy, Plaintiff's treating physician, relative to her severe impairment of right carpal tunnel syndrome. Plaintiff's treating physician, a hand specialist, opined in February, 2004, that Plaintiff had positive elbow flexion for ulnar nerve paresthesias; abnormal flexion, extension, ulnar deviation, and radial deviation tests of her wrists; positive volar edema; significant atrophy of the abductor pollicis brevis muscles on the right; positive left ulnar nerve Tinel's test; positive roll sign, elbow flexion test, median nerves at both wrists, and ulnar nerve at the wrist; and positive compression test to the median and ulnar nerves. Plaintiff had diminished grip and pinch strengths, bilaterally (R. 199-205). These findings did not change during Dr. Kennedy's following examinations of Plaintiff. On March 11, 2004, Dr. Kennedy found Plaintiff did not realize any relief from her pain with cortisone injections (R. 290). On April 7, 2004, Dr. Kennedy opined Plaintiff continued to experience "ongoing problems of carpal tunnel and ulnar nerve impingement at the wrists as well as continued symptoms at the elbows" (R. 182). On March 15, 2006, Dr. Kennedy's findings had changed little from his previous assessments of Plaintiff. In addition to his earlier findings, he opined Plaintiff had diminished grip and pinch due to nerve impingement to the median and ulnar nerves, bilaterally (R. 342). Dr. Kennedy found Plaintiff had diminished range of motion of the left wrist in flexion and

extension and diffuse tenderness throughout all muscle groups of the hands and forearms (R. 346). He found Plaintiff had a twenty percent impairment of the left upper extremity for grip and pinch and a twenty-nine percent whole person impairment based on diminished strength of upper extremities (R. 347). Dr. Kennedy found Plaintiff was limited in her ability to actively work due to fatigue, lack of endurance, poor grip and pinch, and her inability "to do little in the way of any repetitive activity" (R. 348).

In light of the fact that the ALJ did not adhere to the mandate of *Craig*, *supra*, to evaluate "all the available evidence" and did not apply that portion of SSR 96-7p, which provides the ALJ must consider the "statements and other information provided by treating . . . physicians . . . about the symptoms and how they affect the individual," the undersigned finds the ALJ's failure to consider Dr. Kennedy's opinions of Plaintiff's right carpal tunnel syndrome is fatal to her credibility determination, and, therefore, finds substantial evidence does not support the ALJ's determination that Plaintiff's allegations regarding her limitations were not totally credible.

## VI. RECOMMENDATION

For the reasons herein stated, I find substantial evidence does not support the Commissioner's decision denying the Plaintiff's applications for DIB and for SSI. I accordingly recommend Defendant's Motion for Summary Judgment be **DENIED,** and the Plaintiff's Motion for Summary Judgment be **GRANTED** and this action be **REMANDED** to the Commissioner for further action in accordance with this Recommendation for Disposition.

Any party may, within ten (10) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy

40

of such objections should also be submitted to the Honorable John Preston Bailey, United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *Thomas v. Arn*, 474 U.S. 140 (1985).

The Clerk of the Court is directed to mail an authenticated copy of this Report and Recommendation to counsel of record.

Respectfully submitted this _20_ day of _December_ 2007.

JOHN S. KAULL
UNITED STATES MAGISTRATE JUDGE